**Columbia Casualty Company, Appellant, v. Lucille Edwards, Appellee.**

**Gen. No. 10,297.**

Opinion filed August 10, 1949.
Released for publication August 30, 1949.

VOGEL & BUNGE, of Chicago, and FRANK H. MASTERS, JR., of Joliet, for appellant; GEORGE C. BUNGE and ROBERT L. HOWARD, both of Chicago, and FRANK H. MASTERS, JR., of Joliet, of counsel.

FRANCIS J. LOUGHRAN, of Joliet, for appellee; DALE G. NICHOLSON, of Joliet, of counsel.

MR. PRESIDING JUSTICE WOLFE delivered the opinion of the court.

This is a suit by the plaintiff the Columbia Casualty Company, as subrogee of M. A. Felman Company, doing business under the name of The Boston Store, against the defendant, Lucille Edwards, a former employee of The Boston Store in Joliet, Illinois. During the time the defendant was employed in The Boston Store there was in force a primary commercial bond whereby the plaintiff agreed to indemnify The Boston Store against loss of money or other personal property caused by theft, embezzlement . . . , misappropriation, wrongful abstraction or wilful misapplication by one or more of its employees. The principal amount of the bond was $10,000. The plaintiff paid to M. A. Felman Company $6,000 which amount the plaintiff alleges in its complaint was to compromise an alleged abstraction of money and merchandise by the defendant from about May 1, 1941, to October 14, 1944, while she was employed in the layaway department of The Boston Store, a department store in the City of Joliet.

In January 1948, there was a trial before a jury, a verdict of not guilty, and judgment entered for the defendant. A motion for a new trial by the plaintiff was denied and the plaintiff has appealed. It is contended by the plaintiff that the trial court erred in denying its motion for a new trial on the ground that the verdict is contrary to the manifest weight of the evidence and that defendant's counsel made improper argument to the jury. It is further contended by the plaintiff that the court erred, as a matter of law, in giving defendant's instruction Number 2, and refusing to give plaintiff's instruction Number 2.

The charge of the complaint that the defendant abstracted and embezzled money and merchandise of The Boston Store in excess of the plaintiff's bond, is based on alleged admissions of the defendant that she had

during the course of her employment in the lay-away department of the store secreted, and at other times destroyed, duplicate receipts which were not included in her daily calculations and accounts of the money received by her as payments on lay-away merchandise and that she used the payments made, as shown by the duplicate receipts, to her own use. The alleged admissions of the defendant are contained in a written statement signed by the defendant and testimony by Rober J. Supernaw, an adjuster for the plaintiff, and of Charles H. Blim, an assistant states attorney. The evidence bearing on the statement and the alleged oral admissions to Supernaw and Blim will be hereinafter considered.

There is a conflict in the evidence of the plan of the operation of the lay-away department of The Boston Store during the time the defendant was therein employed. From the record it is not possible to state definitely the plan of operation of the lay-away department.

The above-mentioned conflict in the evidence arises from the fact that Mr. Supernaw, who in October 1944, investigated the alleged defalcations of the defendant on behalf of the plaintiff, testified that the defendant told him about the operation of the lay-away department. In her testimony the defendant denied that she had told Supernaw that the department was operated as he stated. The testimony of the defendant on how the department was operated is in direct contradiction to the statements about its operation which Supernaw testified were made to him by the defendant.

It appears from the record that under the lay-away plan of The Boston Store, articles of merchandise which were not to be paid for immediately after their selection by its customers were laid away, or held in the store, to be paid for at a later time, either in instalments or by one full payment. That in the main office

of the store there was kept a control ledger and also a ledger card for each lay-away account.

Basing his testimony on alleged statements made to him by the defendant, Supernaw testified concerning the operation of the lay-away department substantially as follows: That it was the duty of the defendant, as chief clerk of the lay-away department, to receive payments on lay-away articles and make receipts for cash thus received; that the receipts were made in duplicate, the first or original being given to the customer making the payment and the duplicate was kept by the defendant on a spindle on her desk; that after the merchandise was fully paid for, the defendant was required to deliver the article to the customer entitled thereto; that each day after the closing of the store, it was further the duty of the defendant to add the amounts of the duplicate receipts on an adding machine; that the duplicate receipts together with the amounts shown on the tape of the adding machine were correlated with the control ledger items and the credit cards by Mr. Leverthal, the credit manager of The Boston Store; that the defendant was in charge of the lay-away department and the only person who received payments on lay-away articles.

The defendant testified concerning the operation of the lay-away department substantially as follows: I worked in the lay-away department about two and one-half years. I did not tell Mr. Supernaw or anyone else that I was in complete charge of the lay-away department. During the time I worked there, Marian Richardson and Mr. Leverthal were in charge of the department. During the time that I worked in The Boston Store, Dorothy Maren, Jean Wolfe, Jean Thompson, Mrs. Marion Penn, Marion Cutsinger and my sister and Margaret Paulson worked in the department. These people worked under Marion Richardson. Not all of these people had access to the cash and ac-

counts. Dorothy Maren, Jean Wolfe, Jean McGowan, Jean Thompson, Marion Cutsinger and Margaret Paulson had access to the cash and accounts, and they wrote up receipts. At the close of the store each day we added the receipts on an adding machine and put the tape of the adding machine on the receipts and gave them to Mr. Leverthal to go over. He would go over all the receipts and make a tape and check with our tape. After checking them, he would bring them back the next day to post. Marion Richardson and Mr. Leverthal posted the payments on lay-away articles. ''We were behind with the posting on the cards a lot of times, sometimes for a month or two. We had slips after the tape was made up, and they were lying around for a month or so before putting them on the customers' cards.''

Supernaw testified that the defendant told him that some of the customers of The Boston Store would not take the original receipts for payments on lay-away articles and that sometimes, in those cases the defendant would destroy or secrete the original and duplicate receipts. That the defendant showed to him a box in which she had placed duplicate receipts which she had not added in her daily calculations of payments on lay-away articles. That the defendant admitted taking the amounts of money shown on the duplicate receipts which she had placed in the box.

There is no proof in the record of the sums of the alleged destroyed or secreted receipts charged so handled and disposed of by the defendant. There is no proof in the record that there was a discrepancy between the alleged secreted and destroyed duplicate receipts and the ledger entries and the ledger cards controlling lay-away merchandise. The receipts allegedly concealed by the defendant were not introduced in evidence.

Supernaw further testified that owing to the statement made to him by the defendant, that she had de-

stroyed duplicate receipts, he recommended to the Felman Company that an audit be made of the lay-away department. An audit, by accountants, of the lay-away department is in the record. It appears from the audit that as of October 21, 1944, there was a shortage of $17,596.07 in that department. It is not contended, nor is there any proof in the record, that the defendant is liable for the shortage shown in the audit. The proof of the amount of money allegedly abstracted by the defendant as a clerk in the lay-away department rests primarily on the testimony of Supernaw who testified that after he had made an examination of the records of The Boston Store and that an audit of the lay-away department showed a loss of $17,000, that $7,500 of the loss he considered as chargeable to the defendant, and for which latter amount the plaintiff was liable under its bond.

Apparently before the audit of the lay-away department was made, and before The Felman Company had reported any loss in that department to the plaintiff, Albert J. Felman, president of Felman Company, became aware that there was a loss in the lay-away department. A private detective by the name of Anthony Angelico was employed by Felman Company to watch the lay-away department, evidently for suspicious transactions in that department. On October 10, 1944, the defendant was called to Mr. Felman's office and accused by Angelico of not giving a receipt to a customer for a pair of gloves. It is sufficient to say at this time that the defendant in Felman's office on that day signed a written statement, which is as follows:

"The Boston Store                              10/14/44
Joliet, Illinois.

During the course of my employment with M. A. Felman Co. known as The Boston Store, for the past Seventy-five (75) weeks, less two weeks for vacation

period, I have taken for my own personal Use an average of $150.00 dollars (one Hundred fifty dollars) per week. Making a total of $10,050.00 (Ten Thousand and fifty dollars).

I make this statement of my own free will with no threats or promises from anyone. And I have been spoken to in a gentleman manner.

Lucille Edwards
206 Water St.
Joliet, Ill.

Witnessed by
Anthony Angelico
M. A. Felman''

On November 2, 1944, the defendant was requested to come to the office of Irving Shutts, attorney for M. A. Felman Company. There was present at that time, besides Shutts and the defendant, Albert J. Felman, Mr. Supernaw, Mary Lee Edwards, mother of the defendant, and Charles H. Blim, an assistant states attorney of Will county.

Concerning the inquiry and examination of the defendant in Shutts' office, Blim testified substantially as follows: I took a statement from Miss Edwards with a reporter or stenographer, I don't remember who it was. I do not have any present recollection of the contents of the statement. I interrogated Lucille Edwards with regard to money taken by her from The Boston Store. I probably asked the question, ''I show you receipt No. 2317 for $60.00. Do you remember that receipt?'' and she probably answered, ''Yes,'' but I don't know. I don't remember the numbers of the tickets or the amounts of them. I can't answer whether or not she said yes to the question, ''Did you take that money yourself?'' I cannot say definitely that a transcript of the questions asked Miss Edwards was written up. My best recollection of what took place at that time is that Mr. Shutts, Lucille Edwards and her mother, a representative or representatives of one

or more surety companies were there, and I attempted to talk to Miss Edwards who was hysterical. As I remember Lucille Edwards was employed in the lay-away department of The Boston Store. Either she, or someone there had a number of tickets which were made either in duplicate or triplicate at the time the payment was made on a contract of purchase. I think when they made the tickets, one would go to the office and the other was supposed to go through some kind of a machine; that some of the tickets she did not run through the machine. There were a few of them that involved a great deal of money, which she did not run through the machine or tape; that she took the money on hers. I was going to question the defendant later as she took for the window. All the persons I mentioned as being in Shutts' office were not in the office when I took the statement from Miss Edwards. I think Miss Edwards, her mother, Shutts and a stenographer were present when I questioned Miss Edwards. I undoubtedly asked her if her answers were true and if her answers would be the same if asked on another occasion, and told her that the statement could be used against her. She admitted taking the money represented by the receipts which had not been run through the machine or tape. The receipts which she did not run through the machine did not involve much money. They did not involve as much money as she was accused of taking. Mr. Shutts probably gave me those receipts. I exhibited the receipts to Lucille Edwards and asked her to identify them as to whether or not she got the money. As I remember, the receipts that they showed to me there that day were both taped and untaped. Altogether, I probably had 40 or 50 of them running from $4 to about $75. I added up the untaped receipts, but I could not say whether it was $1,000 or more or less. It was far from what she was accused of taking. It was around $1,000. I added them up, but what the figure was I have no idea. I told her I

was from the states attorney's office. She was in a hysterical condition. "Somebody was working her over." (Motion to strike last sentence by plaintiff, sustained by the court.)

Mr. Shutts testified about the examination of the defendant in his office so far as now pertinent. The defendant's mother was there and she told the defendant to tell the truth. As far as working anybody over, there was nothing of the kind as far as I knew. There was proof of loss furnished the plaintiff for $17,596.07, and that was settled later by me for Mr. Felman for $6,000. The settlement was a result of negotiations between the bonding company and myself. "My memory tells me that I saw the receipts that were produced in my office. They came from The Boston Store. As far as I know, they went back to the store."

The fact that the defendant had signed the statement of October 14, 1944, and that she had been interrogated by Assistant States Attorney Blim, were facts undoubtedly known to the plaintiff's attorney before the trial of the case. The plaintiff tried its case on the theory that the admissions of the defendant, and such further testimony which the plaintiff could elicit from the defendant as an adverse witness under section 60 of the Practice Act [Ill. Rev. Stat. 1947, ch. 110, par. 184; Jones Ill. Stats. Ann. 104.060], would prove that the defendant had abstracted or embezzled money and merchandise of the plaintiff and the amount thereof. It may be stated here that the testimony of Supernaw to the effect that he had examined the records of The Boston Store and considered the defendant chargeable with the amount of $7,500 on account of the shortage in the lay-away department of the store, under the facts and circumstances appearing in the record, is not sufficient on which to find that the defendant abstracted, or embezzled $7,500 from The Boston Store. No records of The Boston Store were introduced in evidence to substantiate Mr. Supernaw's

testimony on that point, nor were any duplicate receipts offered in evidence, which the plaintiff claims were secreted by the defendant.

The first witness called by the plaintiff was the defendant under section 60 of the Practice Act. Concerning the statement signed by the defendant on October 14, 1944, wherein the defendant admitted taking to her own use money of The Boston Store to the amount of $10,050, the defendant testified as follows: I was called to Mr. Felman's office. He introduced me to Mr. Angelico. Mr. Felman said they had found a loss in the lay-away department, and stated that I had not given a lady a receipt for a pair of gloves. I told him that I did. I did not remember the transaction. Mr. Felman said that I had taken money from the department and I told him that I did not. Mr. Angelico said, "Yes, you have. We have proof that you have taken the money." I asked him where is the proof? Then Mr. Felman said, "Well, we have receipts showing that you have taken money." I kept telling them that I hadn't taken any money. Mr. Felman went away and left me with Mr. Angelico. Mr. Angelico said he would make it hard for me. He said, "You know in cases like this where a negro takes money in the South, they hang or lynch him." I got hysterical and started to jump out of the window. He said, "Sit down." He said that they were going to make it very hard for me if I did not sign a statement that I had taken the money. That there was a bond for $10,000 and that I would have to sign a statement that I had taken $10,000. I told him that I had not taken the money, that I would not sign or write it. I was hysterical. I asked if I could have a lawyer. He told me that I did not need a lawyer. I asked him why he did not question the other girls. He said, "We know you are the one involved." I did not know what to do, and when he dictated to me, I wrote down what he said, I did not want to sign the statement. Mr. Angelico told me that I had to sign so

that Mr. Felman could get his loss back. Then Mr. Felman came back and he said if I would sign the statement he could get his loss back. Mr. Felman told me that if I signed the statement, I would not lose my job. I had been in the office two hours before I signed the statement.

Further examining the defendant as an adverse witness, counsel for the plaintiff read questions and answers from a paper which he had and inferentially the statement taken by Blim from the defendant in Shutts' office. The defendant answered that she did not remember making the answers to the questions as indicated by counsel were made in the statement. In particular that she did not remember that she answered "yes" to the questions if she had taken money as appeared on the paper held by counsel.

There was no statement taken in Shutts' office which was signed by the defendant. There was not introduced in evidence a statement made by the defendant in Shutts' office. There is no proof in the record what answers the defendant made to questions asked her by Blim in Shutts' office. Mr. Blim, as hereinbefore stated, testified that he had no recollection of the contents of the statement.

The defendant as witness on her own behalf denied that she had taken money while employed in the layaway department of the store. That receipts shown to her by Blim, at the time of the inquiry in Shutts' office, bore initials of other persons than her own. That when she was first employed to work in the layaway department she was told by those in charge of the department that there was a shortage in the department in old accounts.

Mary Lee Edwards testified, in part as follows: The early part of November I received a call from Mr. Felman who told me to come to Mr. Shutts' office. Mr. Felman told me that he wanted me to bring Lucille as he had "some receipts he wanted to show me in the pres-

ence of Lucille.'' When I came to Mr. Shutts' office the following morning the following were there, Messrs. Felman, Supernaw, Blim and Leverthal. ''They got out the receipts.'' Mr. Felman said he had some money missing and that he wanted Lucille to sign a paper, so that he could get his money back. Lucille started hollering and crying. She said that she had not taken any money. She started to run to the the window. Mr. Blim caught Lucille. ''Finally, they kept on working on her and she was crying and hollering. Mr. Blim said to those fellows leave her alone, she is in no condition.'' Mr. Blim grabbed her and set her down. He said to everyone, leave this girl alone. Then he told me to get out, that I could go home. Lucille and I went home. Mr. Felman had told me to be in Mr. Shutts' office the next morning. The statement was taken the next morning when Mr. Supernaw, Mr. Felman, Mr. Shutts and Mr. Shutts' secretary were present. I do not remember seeing Mr. Blim that day. Mr. Felman asked Lucille if she remembered signing a paper at the store and told her he wanted her to sign another one because he had to get his money out of the insurance company. She said that she had not taken any money. Mr. Supernaw said it was the best thing to sign the paper. Then she signed it. I do not know who has the papers. About three months later I saw Mr. Shutts and Mr. Felman again in Mr. Shutts' office. Mr. Shutts walked out of the office and Mr. Felman said, ''I want Lucille to sign a paper.'' I told him she can't sign papers; she has got to have a lawyer. They said she does not need a lawyer. I walked out of the office.

How many papers were signed by the defendant at the request of Mr. Felman does not appear in the evidence. The evidence on this matter is confusing.

Albert J. Felman testified that he never asked the defendant to sign a statement in order for him to make recovery on the bond. With reference to the inquiry

in Shutts' office, he testified that he did not recall that Mr. Blim showed receipts or papers to the defendant. "I remember some of the lay-away department receipts being in the office of Mr. Shutts. I have no idea where those receipts are now. They were in the possession of the store before they were in Mr. Shutts' office."

■■ The evidence in this case on the material issue presented to the jury consists of admissions and denials by the defendant. There is little value in the testimony bearing on the examination of the defendant in Mr. Shutts' office that is favorable to the plaintiff. The admissions which witnesses testified were made by the defendant and were given under circumstances and conditions on which there is a conflict in the testimony. The failure of the plaintiff to introduce in evidence the duplicate receipts allegedly secreted by the defendant, warranted the jury in drawing the conclusion that the receipts were unfavorable to the plaintiff's case. The verdict is not contrary to the manifest weight of the evidence.

During his argument to the jury, the attorney for the defendant stated as follows: "Now ladies and gentlemen, you will recall the statement of Mr. Blim which was stricken by the court, 'that the defendant had been worked over before Mr. Blim got to Mr. Shutts' office.'" A motion was made by the plaintiff's attorney at this point, and he asked the court to instruct the jury to disregard the above remark of plaintiff's counsel. The court sustained the objection and instructed the jury to disregard all arguments on matters not in evidence in the case. It is contended by the plaintiff that the remark thus made to the jury by counsel for the defendant is reversible error.

■ As before stated, the inquiry in Mr. Shutts' office yielded little in the way of proof that the defendant abstracted and embezzled money and merchandise of the defendant and the amount of such alleged

embezzlement. The court in its written instructions to the jury directed the jury to disregard any matter or thing which may have in anyway been suggested by matters outside of the evidence, or which the court held improper. The above quoted remarks of counsel for the defendant to the jury were improper. However, under the record and the facts appearing in evidence it was not reversible error.

It is contended by the plaintiff that the court erred in giving instruction Number 2 on behalf of the defendant, which is as follows: "The Court instructs you that the fact, if you find it to be a fact, that the Columbia Casualty Company, a corporation, paid money as damages to M. A. Felman Company, a corporation, that the payment of it, or the amount of it, is not conclusive upon the defendant in this case, nor is the amount so paid by the Columbia Casualty Company, if you find any amount was paid, the basis upon which you could return a verdict against the defendant herein in any amount whatsoever."

Given instruction Number 3 of the defendant is as follows: "The jury have no right to guess or conjecture that M. A. Felman Company, having suffered a loss, and that the Columbia Casualty Company settled with the M. A. Felman Company, and paid the said M. A. Felman Company money as damages, that that amount is chargeable to the defendant in this case; but the Columbia Casualty Company must show, by preponderance of the evidence, as to what damages were sustained by said M. A. Felman Company."

Instruction No. 6, given on behalf of the plaintiff, is as follows: "You are instructed that if you find the defendant guilty, you will be required to determine the amount of the plaintiff's damages if any. In determining the amount of damages the plaintiff is entitled to recover in this case, if any, you have the right to and you should take into consideration all the facts and circumstances as proven by the evidence before

you, and you may find for the plaintiff such sum as, in your judgment, under the evidence and instructions of the Court, the plaintiff was required to pay under its bond to M. A. Felman Co., doing business as The Boston Store, by reason of dishonest acts, if any, on the part of the defendant.''

Considering the instructions given as a series, we are of the opinion that the jury understood that the amount paid by the plaintiff to M. A. Felman Company could not be a basis on which the jury could find the defendant guilty of abstracting money, or merchandise belonging to the M. A. Felman Company, unless the plaintiff proved that the amount so paid was due to the dishonesty of the defendant.

■■ The plaintiff contends that the court erred in refusing to give its instruction Number 2, which is as follows: ''You are instructed that if you believe from a preponderance of the evidence, that the defendant is guilty as charged in the plaintiff's complaint, then it makes no difference, as to the responsibility of the defendant, whether such guilt appears and is proved by the testimony on the part of the plaintiff, or by the testimony of the defendant.'' This instruction was properly refused by the court, as there were others that fairly instructed the jury on the burden of proof. Instructions should be based on the evidence in the case. The record shows that the defendant, Lucille Edwards, has denied that she is guilty of any misappropriation of The Boston Store funds. This court held that such an instruction was improper in the case of *Bliss v. Knapp*, 331 Ill. App. 45.

This case was submitted to a jury for their consideration, and by their verdict, they have found the issues for the defendant. We cannot say that their verdict is contrary to the manifest weight of the evidence, therefore, it is our conclusion that the judgment of the trial court should be, and is affirmed.

*Judgment affirmed.*